**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **PRINCE GEORGE'S COUNTY,** | * |
| **MARYLAND,** *et al.*, | * |
| | * |
| Plaintiffs, | * |
| v. | *  Civil No. PJM 18-3576 |
| | * |
| **WELLS FARGO & CO.,** *et al.*, | * |
| | * |
| Defendants | * |

<u>**MEMORANDUM OPINION**</u>

Prince George's County, Maryland, and Montgomery County, Maryland (collectively "the Counties") bring this suit against Wells Fargo & Company and related entities[1] for what the Counties allege have been predatory and discriminatory residential mortgage lending, servicing, and foreclosure practices in violation of the Fair Housing Act. Defendants have filed a Motion to Dismiss (ECF NO. 24). The Court has considered the parties' briefs and oral argument, as well as their supplemental briefing on a recent relevant court decision, and will **GRANT-IN-PART, DEFER-IN-PART,** and **DENY-IN-PART** the Motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Counties filed a 166-page Complaint in this Court on November 20, 2018, alleging violations of the Fair Housing Act (FHA), 42 U.S.C. §§ 3601, *et seq*. They assert that Defendants engaged in predatory lending practices relative to FHA-protected minority communities, which

---

[1] Other Defendants include Wells Fargo Bank, N.A. (a subsidiary of Wells Fargo & Co.), Wells Fargo Financial, Inc. (which was a subsidiary of Wells Fargo & Co. before it transferred its lending operations to Wells Fargo Bank), and Wells Fargo "John Doe" Corps. 1-375 (affiliates or subsidiaries of Wells Fargo & Co. that may be responsible for the conduct alleged in the Complaint. According to the Counties, Defendants established and/or maintained some 378 subsidiary and affiliate correspondent lenders throughout the United States, as reflected in publicly available data reported pursuant to the Home Mortgage Disclosure Act. Such parties are named in "John Doe" capacities pending discovery in the case).

they say contributed to the recent financial crisis characterized by mortgage loan delinquencies, mortgage loan defaults, foreclosures, and home vacancies across the country and more specifically in Plaintiff Counties, particularly in communities with high concentrations of FHA-protected minority residents. ECF No. 1 at ¶¶ 3-4. The Counties sue as individual aggrieved persons under 42 U.S.C. § 3602(i), not in their *parens patriae* capacities. *Id*. at ¶¶ 16-17.

The Counties proceed under both Disparate Impact and Disparate Treatment theories, *see* ECF No. 1 at ¶ 72 *et seq*., ¶ 318, and allege both economic and non-economic harms. Their suit consists of three counts. The first count is for disparate impact resulting from Wells Fargo's "equity-stripping"[2] scheme, beginning with loan origination and continuing through servicing and mortgage foreclosure. Compl. ¶¶ 434-58. The second count is for disparate impact based solely on Wells Fargo's mortgage servicing and foreclosure practices. Compl. ¶¶ 459-73. The third count alleges intentional disparate treatment throughout the entire equity-stripping scheme. ¶¶ 474-484.

The Counties seek <u>economic</u> damages to cover the costs associated with foreclosure-related processes, including those associated with foreclosure notices; the registration and monitoring of empty properties; the securing and maintenance of those properties and Sheriffs' evictions; municipal services (e.g., police, fire, etc.) provided with respect to those properties; social services rendered to evicted or foreclosed homeowner-borrowers; reduced property values; loss of property and concession tax revenue (the Counties to not define the latter); loss of property tax revenue not

---

[2] "Equity-stripping" is defined as a comprehensive set of loan origination and servicing practices that "effectively dilute[s] or eliminate[s] the equity that borrowers ha[ve] in their homes—compris[ing] numerous components," including predatory lending practices, higher loan origination costs, higher than usual interest rates, exorbitant fees, and increased foreclosure rates. *County of Cook v. HSBC North America Holdings, Inc.*, 314 F. Supp. 3d 950, 955 (E.D. Ill. 2018). Equity-stripping, when focused on minority communities, can contain aspects of "reverse redlining," i.e., "the targeting of residents based on income, race, or ethnicity, and extending credit on unfair terms." *In re Wolfe*, No. 99-12837PM, 2000 WL 36688916 at *1 (D. Md. 2000).

recovered via tax lien sales; lost revenue from certain utility operations; and lost recording fees. *Id.* at ¶ 399.

The Counties also seek damages for <u>non-economic</u> injuries resulting from neighborhood deterioration, blight, and urban decay, *see id.* at ¶¶ 391, 400; the segregative effect of foreclosures involving minority and female-led households, *see id.* at ¶ 392; and the redirection of resources, *see id.* at ¶¶ 402-07.

On January 25, 2019, Defendants filed the pending Motion to Dismiss. The Court set oral argument on May 14, 2019. However, following briefing but shortly before oral argument, the U.S. Court of Appeals for the Eleventh Circuit issued its opinion in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) (*Miami*).[3] Because Counsel had not had the opportunity to brief the Eleventh Circuit opinion by the May 14 oral argument, the Court granted the parties leave to file supplemental briefing to address the Eleventh Circuit's decision, specifically its analysis of proximate cause in the context of FHA cases. The Counties and Defendants filed supplemental papers on June 28, 2019, and responses to the other's supplemental papers on July 15, 2019.

## II.     DISCUSSION

### a.  *Motion to Dismiss Standard*

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir.2006). A plaintiff's complaint need only satisfy

---

[3] The Eleventh Circuit decision is the latest in a series of lawsuits brought by the City of Miami against Bank of America and Wells Fargo, both of which allege the same types of FHA violations and injuries as those the Counties assert here. In *Bank of America Corp. v. City of Miami*, 137 S.Ct. 1296 (2017) (*City of Miami*), the Supreme Court held that municipalities are within the zone of interests of the Fair Housing Act, but remanded the case to the lower courts to determine the contours of proximate cause in the context of such cases as *City of Miami* and the case at bar. *See id.* at 1305-06. The Eleventh Circuit's decision to date is the only decision by a federal appellate court (other than the Supreme Court) that has developed a full-blown proximate cause analysis in these cases.

the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007), and a complaint must "state a claim to relief that is plausible on its face." *Id.* at 570 (2007).

### b. Arguments in Support of Defendants' Motion to Dismiss

Defendants advance four arguments why the Court should dismiss the Counties' claims: (1) that the Counties have failed to plead plausible proximate cause; (2) that the statute of limitations on the alleged FHA violations ran before the case was filed; (3) that the Counties have failed to plausibly allege any violation of the FHA under either disparate impact or disparate treatment theories; and (4) that the Counties have failed to allege any actionable injuries.

### c. The Objective of the Fair Housing Act

The Fair Housing Act is a "far-reaching" statute that "takes aim at discrimination that might be found throughout the real estate market and throughout the process of buying, maintaining, or selling a home." *Miami*, 923 F.3d at 1279. It prohibits discrimination against home buyers or renters "because of race, color, religion, sex, familial status, or national origin." *Id*. at 1278 (quoting 42 U.S.C. § 3604(a)-(b)). As many courts have recognized, "the FHA has a broad remedial purpose." *Miami*, 923 F.3d at 1278. *See also, e.g.*, *Cobb County v. Bank of America Corp.*, 183 F. Supp. 3d 1332, 1340 (N.D. Ga. 2016) (discussing "the FHA's broad remedial purpose"), *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of America*, 208 F. Supp. 2d 46, 55 (D.D.C. 2002) ("The Supreme Court has indicated that the FHA should be broadly construed to effectuate its remedial purpose…"), *National Fair Housing Alliance v. Bank of America, N.A.*, No. CCB-18-1919, 2019 WL 3241126, at *11 (D. Md. July 18, 2019) (endorsing

the Eleventh Circuit's definition of proximate cause and description of the FHA's broad remedial purpose in *Miami*).

### d. Proximate Cause

In *Bank of America v. City of Miami*, the Supreme Court held that "foreseeability alone is not sufficient to establish proximate cause under the FHA." 137 S.Ct. 1296, 1305 (2017). Instead, the Court explained, "proximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 1306 (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)). Rather than itself drawing the precise boundaries of what proximate cause entails under the FHA, the Court directed that "lower courts should define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses." *Id.*

Defendants argue that in undertaking this exercise the Court should consider four "directness principles," drawn from *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), which they believe weigh in their favor: the numerosity of the links in the chain of causation between the purported violation and the injury; whether the purported harm is derivative of another's injury such that a different party would be better positioned to recover for the injury; whether the purported harm is firmly attributable to the alleged violation, and whether determining and apportioning damages would be unduly complicated. ECF No. 24-1 at 10-15.

Since the Supreme Court's directive as to proximate cause, several courts have delivered opinions on the matter, which guide this Court in its present analysis. Those opinions tend to analyze proximate cause as to each type of injury municipal plaintiffs have alleged. *See City of*

*Philadelphia v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451 (E. D. Penn. Jan. 16, 2018),

*City of Oakland v. Wells Fargo Bank*, No. 15-cv-04321, 2018 WL 3008538 (N.D. Cal. June 15,

2018), *County of Cook, Illinois v. Wells Fargo & Co.*, 314 F.Supp.3d 975 (N.D. Ill. March 26,

2018) ("*Cook County (Wells Fargo)*"), *County of Cook v. Bank of America Corporation*, No. 14 c

2280, 2018 WL 1561725 (N.D. Ill, March 30, 2018) ("*Cook County (Bank of America)*"), *County*

*of Cook v. HSBC North America Holdings Inc.*, 314 F. Supp. 950 (N.D. Ill. May 30, 2018) ("*Cook*

*County (HSBC)*"), *City of Miami v. Wells Fargo & Co*, 923 F.3d 1260 (11th Cir. 2019) ("*Miami*").

The Court will therefore discuss proximate cause as it relates to the Counties' claimed

injuries by identifying five broad categories of injuries the Counties allege. <u>First,</u> as to foreclosure

processing costs (costs associated with foreclosure-related processes, including foreclosure

notices, court proceedings, Sheriffs' auctions, Sheriffs' evictions, and registration, monitoring, and

maintenance of empty properties); <u>Second,</u> as to the increased cost of municipal services

(including municipal services rendered with respect to foreclosed properties such as fire and

police, and social services rendered to evicted or foreclosed borrowers); <u>Third,</u> as to economic

injuries to the Counties' tax bases (including reduced property values, loss of property and

concession tax revenue, and loss of property tax revenue not recovered via tax lien sales); <u>Fourth,</u>

lost municipal income (including lost revenue from certain utility operations and loss of recording

fees); and <u>Fifth,</u> as to non-economic injuries (including neighborhood deterioration, blight and

urban decay, the segregative effect of Defendants' alleged equity-stripping, and the encroachment

on the Counties' missions of supporting diverse and inclusive communities).

i.    <u>Proximate Cause in Municipal Suits Under the FHA</u>

In *City of Miami v. Wells Fargo & Co.*, the Eleventh Circuit, interpreting the Supreme

Court's directives in *Bank of America Corp. v City of Miami*, 137 S.Ct. 1296 (2017), articulated in

considerable detail its view of proximate cause in the FHA context. 923 F.3d 1260 (11th Cir. 2019). After discussing the FHA's text and legislative history, the Eleventh Circuit concluded that "[p]roximate cause asks whether there is a direct, logical, and identifiable connection between the injury sustained and its alleged cause. If there is no discontinuity to call into question whether the alleged misconduct led to the injury, proximate cause will have been adequately pled." *Id*. at 1264.[4] In reaching its definition of proximate cause and how it should apply in municipal cases involving the FHA, the Eleventh Circuit considered the directness principles Defendants emphasize here, as well as the text and history of the FHA, and the meaning of the words 'some direct relation.'[5]

---

[4] As Defendants rightly point out, the Eleventh Circuit's decision is not binding on the Court, nor of course are the decisions of the district courts in Illinois, Pennsylvania, and California that have also considered this issue. However, such decisions may certainly constitute persuasive authority. *See, e.g.*, *Chevron Corp. v. Page (In re Naranjo)*, 768 F.3d 332, 346 (4th Cir. 2014) (deference to well-reasoned decisions of sister courts is often appropriate) (collecting cases). The Eleventh Circuit's recent decision in particular includes a very thorough analysis of the statutory and contextual history of the FHA and suits like the present one. The Court finds the reasoning persuasive and the definition of proximate cause apt.

[5] The Eleventh Circuit's parsing of the term 'some direct relation' as illustrative of proximate cause is worth quoting at length:

> There is give in the joints between "some direct relation" and "some direct causation." These are not identical concepts, and so when, for example, Bank of America suggests that Miami's injuries "were not caused 'directly' by a loan," it may not be presenting the question in a way that precisely and accurately reflects the Court's instruction. We might agree that the injuries were not "caused directly by a loan" and yet still find "some direct relation" between the injury and the statutory violations. Causation is "the act or process of causing," and to "cause" something is "to serve as cause or occasion of" or "to bring [it] into existence." Webster's Third New International Dictionary 356 (2002). Relation, on the other hand is "the mode in which one thing or entity stands to another, itself, or others," or "a logical bond." Id. at 1916. We are considering "direct relation," as a critical aspect of "proximate cause," so some palpable causation is required. We ought not forget, though, that foreseeability, while insufficient on its own, remains a requirement and ensures some causal connection. "Some direct relation," then, works to guarantee that there is a "logical bond" between violation and injury. Put another way, while foreseeability ensures "cause," "some direct relation" ensures that the cause is sufficiently "proximate."

> Further, the law requires "some direct relation" not any quantifiable amount of it. The standard is softened by the modifier "some," meaning, "of an unspecified but appreciable or not inconsiderable quantity, amount, extent or degree." Id. at 2171. The requirement is therefore somewhat easier to meet than if the Court had said [it was necessary] to find "a direct relation."

Id. at 1272.

This Court is not the first to note that, as Prosser and Keeton, the torts gurus, aptly commented, "[t]here is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion" than the concept of proximate cause. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41, at 263 (5th ed. 1984). Those authors set out a framework that is helpful for understanding the Supreme Court's directive in *City of Miami*:

> "Though there are countless variations of theory in this area…. One of these theories is that the scope of liability should ordinarily extend to but not beyond the scope of the "foreseeable risks"—that is, the risks by reason of which the actor's conduct is held to be negligent. The second, contrasting, theory is that the scope of liability should ordinarily extend to but not beyond all "direct" (or "directly traceable") consequences and those indirect consequences that are foreseeable."

*Id.* § 42, at 273.

In *City of Miami*, the Supreme Court rejected the first theory recognized by Prosser and Keeton—i.e., mere foreseeability—as the basis for proximate cause in municipal claims under the FHA. 137 S.Ct. at 1305. But the Court suggested a softened stance for "direct relation" by referring to the requirement of only "some" direct relation of cause and effect (as opposed to "the" direct relation of cause and effect), and in so doing the Court appears to have moved closer to Prosser and Keeton's second theory of proximate cause—that a consequence must be directly traceable to a cause. The Eleventh Circuit's definition also suggests that if there is no discontinuity that calls the causation into question, there is some direct relation between the action and effect. This Court agrees with the Eleventh Circuit that proximate cause in the context of FHA suits, such as the present one, is fairly pled where the injury is directly traceable to the purported violation, without a discontinuity that breaks the connection. The Court, then, is guided by this definition in evaluating the Counties' pleadings of proximate cause for each category of their claimed injuries.

ii.    Foreclosure Processing Costs

The Counties allege that they incurred out-of-pocket expenses associated with processing foreclosures occasioned by Defendants' purported violations, including costs for foreclosure notices, court proceedings, Sheriffs' auctions, Sheriffs' evictions, and registration, monitoring, and maintenance of empty properties. ECF No. 1 at ¶¶ 9, 399. They claim these costs are easily calculable based on the addresses of properties Defendants foreclosed upon and Defendants' loan application registry, as well as their loan servicing and loan default data, all of which can be obtained through discovery. *Id.* at ¶ 407.  Defendants counter that even if costs were incurred processing foreclosures, the Counties suffered no harm because they are reimbursed by the State of Maryland for such costs.

The Court finds that the 'some direct relation' standard is well pled in regard to these claimed injuries. Foreclosure would be the final process in the discriminatory equity-stripping cycle that the Counties allege Defendants have perpetrated against FHA-protected minority residents. The Counties' costs in processing those foreclosures would be a direct first-step consequence of that cycle. Increased foreclosures due to discriminatory subprime lending equate with increased expenses that come directly out of the Counties' budgets to process the foreclosures. The Counties have therefore plausibly alleged proximate cause as to these injuries. Indeed all three courts to consider the claims of Cook County, Illinois were satisfied that similar claims for injuries should go forward.[6] *See County of Cook, Illinois v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 984 (N.D. Ill. March 26, 2018) (foreclosure processing costs are so "integral an aspect of the violation alleged, there can be no question that proximate cause is satisfied." *Id*. (quoting *Lexmark Int'l, Inc.*

---

[6] None of the other cases cited herein, including the recent Eleventh Circuit decision in *Miami*, involved claims for foreclosure-related damages. *See* 923 F.3d at 1286 n.11.

*v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014)); *see also County of Cook v. Bank of America Corporation*, No. 14 c 2280, 2018 WL 1561725 at *7 (N.D. Ill, March 30, 2018) (explaining that foreclosure-related costs are plausible within the first step of causation), County of *Cook v. HSBC North America Holdings Inc.,* 314 F. Supp. 950, 963 (N.D. Ill. May 30, 2018) (same).

As to Defendants' argument that the Counties were reimbursed for those costs, any reimbursement that the Counties may have received and any offset that may be due as a result of such reimbursement are questions more appropriate for summary judgment when evidence pertaining to those allegations has been gathered and analyzed.

iii.     <u>Increased Municipal Services Costs</u>

The Counties also claim damages based on the cost of having to provide municipal services on foreclosed properties, such as fire and police, as well as social services that were needed to assist evicted or foreclosed borrowers. ECF No. 1, ¶¶ 9, 399, 402, 403. Thus, the Counties allege, albeit somewhat summarily, that they "have been required to provide a multitude of services relating to those abandoned, vacant and/or foreclosed properties that would not have been necessary if such properties were occupied." *Id.* at ¶ 402. The Counties suggest the same methodology in support of ascertaining these costs as they offer for their foreclosure-related processing costs: that is, once they obtain foreclosed property addresses and Defendants' loan application registry, as well as loan-level data, they will be able to establish proximate causation. ¶ 407.

Such injuries as these, however, are certainly further removed from Defendants' alleged equity-stripping practices than are the costs associated with processing foreclosures. Services

rendered by a fire or police department may depend on numerous factors other than merely whether it involved a foreclosed-upon property. Similarly, community members allegedly in need of social services as a result of discriminatory lending practices may well have been affected by many more diverse factors than a predatory home loan. The Counties have not alleged any plausible methodology by which they might be able to isolate and identify those municipal services costs which are directly attributable to the complained-of practices.

Other courts considering damage claims for comparable municipal services have in fact found them insufficient to establish probable cause. The *City of Oakland* court, for example, dismissed the municipal expenditure claims without prejudice because Oakland had not alleged that it could specifically identify the costs attributable to Wells Fargo's purportedly discriminatory activities, nor had the City maintained that there was a statistical method to determine the same. 2018 WL 3008538 at *10. In *Cook County (Wells Fargo)*, the court explained that increased demand for county services, and other purported damages, are "precisely the 'ripples' that *City of Miami* cautions 'flow far beyond the defendant's misconduct[,]… risk[ing] massive and complex damages litigation." 314 F.Supp.3d at 988 (quoting *City of Miami* at 1306). Other *Cook County* courts have reached similar conclusions.[7] The Eleventh Circuit also explained that "the City's pleadings fall short of sufficiently alleging 'some direct relation' between the Banks' conduct and a claimed increase in expenditures on municipal services. The complaints fail to explain how these kinds of injuries… are anything more than merely foreseeable consequences" of the discriminatory actions, and the Supreme Court has already explained "that foreseeability alone is not enough." *Miami*, 923 F.3d at 1264. Here, the Counties have similarly failed to plead specifics about what

---

[7] The Court is aware, however, that plaintiffs in all three Cook County cases have filed motions for reconsideration in light of the 11th Circuit's recent *Miami* decision. ECF No. 50 at 3-4.

their injuries are or how they might be identified and isolated. Accordingly, for now the Court will defer ruling on these claims and will, as indicated *infra*, allow the Counties time to amend their complaint to include more detail in respect of the claims, if indeed they are able to do so.

iv.    Tax Base Injuries[8]

One of the most discussed and contested issues courts have considered in cases similar to the present one is whether municipalities have plausibly alleged that practices such as Wells Fargo's alleged equity-stripping scheme proximately caused injuries to the municipalities' tax bases. None of the *Cook County* decisions allowed injuries based on lost property taxes to go forward.[9] *See Cook County (Wells Fargo)*, 314 F.Supp.3d at 988 (property tax injuries are precisely the ripples that the Supreme Court cautioned against in *City of Miami*); *Cook County (Bank of America)*, 2018 WL 1561725 at *5 ("tax losses… do not flow directly from the discrimination [the County] alleges."); *Cook County (HSBC)*, 314 F. Supp. 3d at 964 ("To the extent the County's claim of injury from lower tax revenue is predicated… on a diminishment in a property's value post-foreclosure, this introduces significant concerns about measuring the diminishment in value attributable to HSBC's conduct…").

However, before the *Miami* decision of the Eleventh Circuit, the court in *City of Oakland* held that Oakland had plausibly alleged such injuries by explaining how a regression analysis, specifically a Hedonic analysis, could identify the portion of Oakland's decreased property taxes that could be fairly attributed to Wells Fargo's allegedly discriminatory conduct. *See* 2018 WL 3008538 at *8. The plaintiff's detailed explanation of this analysis was clearly important to the

---

[8] The Court considers this category of injuries to include reduced property values, loss of property and concession tax revenue, and loss of property tax revenue not recovered via tax lien sales.
[9] But, again, plaintiffs in those cases have apparently asked the courts to reconsider their decisions in light of the Eleventh Circuit's recent ruling. *See* n.7, *supra*.

*Oakland* court, because, by way of contrast, the court dismissed without prejudice Oakland's municipal services claims since it "had proffered no statistical analysis" supporting those claimed injuries. *Id*. at *9.

The Eleventh Circuit accepted an argument similar to that made in *City of Oakland* in *Miami*, citing the same specific type of statistical analysis that influenced the court in *City of Oakland*: a Hedonic regression technique. 923 F.3d at 1268. The Eleventh Circuit discussed the Hedonic regression analysis at length. *See id.* at 1282-85. Ultimately, the Eleventh Circuit concluded that "[t]he plausibility of hedonic regression analysis has a direct bearing on how 'difficult it is to ascertain the amount of [the City's] damage attributable to the violation, as distinct from other, independent, factors, and thus helps determine 'what is administratively possible and convenient,' in terms of damages calculation." *Id*. at 1284 (internal citations omitted). The key for the Eleventh Circuit, then, was not just that Miami had alleged the tax-based injuries; it had specifically set forth how it would prove those injuries, which is to say, isolate them as resulting from Wells Fargo's alleged misconduct, and tie the two together.

As they presently stand, the Counties' pleadings are not as specific as those in *Miami*. They merely allege that "[r]outinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiffs have lost as a direct result of Defendants' discriminatory equity-stripping activities…," ECF No. 1 at ¶ 412, that they can determine the damage attributable to Wells Fargo's conduct "[u]sing well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques," *id.* at ¶ 413, and that the damages "can be established with statistical evidence and expert testimony." *Id*. at ¶ 418. These statements, while quite possibly true, are simply too vague. They do not, in the Court's view, attain

the level of specificity necessary to alleviate concerns such as those expressed by the court in *Cook County (HSBC)* and leave open the question of whether the alleged calculations are actually plausible.

The Court is not prepared to say that a Hedonic regression analysis, such as the courts in *Miami* and *City of Oakland* found so reassuring, is the only way to isolate and ultimately prove damages to the Counties' tax bases. Even so, in the Court's view, the Counties must do more to show—not just declare—how they propose to isolate the damages to their tax bases attributable to Defendants, such that a 'direct relation' between the two is clear. Accordingly, the Court will defer ruling on the Counties' claim for damages to their tax bases at this point, but will allow the Counties time to amend their Complaint to see if they can more adequately plead this point. Further, if there is some limited and carefully tailored discovery that might permit the Counties to buttress their claim and the methods they feel may better explain it, they should petition the Court for that relief in a brief, separate filing, as hereinafter set forth.

v.  Lost Municipal Income

The Counties also claim lost municipal income, including lost revenue from certain utility operations and lost recording fees due to Defendants' use of the Mortgage Electronic Registration Systems (MERS), a private system for tracking, assigning, and trading mortgage loan interests. ECF No. 1 at ¶¶ 376-78, 399. As to lost revenue from utility operations, the Counties aver little more than to note that they have suffered losses, and that the use of MERS makes it difficult to recover things like utility fees from the correct party. As to specifics referencing the loss of recording fees, the Counties allege only that "MERS has saved industry participants—and denied public recording systems operated by County governments such as Plaintiffs here—a total of over $2 billion in public recording fees." *Id.* at ¶ 376.

In *Cook County (HSBC)*, apparently the only court to explicitly discuss a Bank's use of MERS, the court explained: "Assuming that HSBC's use of the MERS database was improper, the County states a squarely direct relationship between HSBC's use of the MERS database and the County's resulting loss of recording income." 314 F. Supp. 3d at 965.

Here, too, the Counties claim that Defendants' use of MERS led to the Counties' inability to recover recording fees, among other things. *See* ECF No. 1 at ¶¶ 376-78. However, while the Counties assert that "industry participants" have suffered over $2 billion in losses due to the use of MERS, they have not alleged how much, even by rough estimate, the Counties themselves may have suffered as a result of Defendants' use of MERS. Nor have the Counties alleged how they propose to determine and isolate the causal links. The Counties therefore will have to bolster their Complaint by putting forth more specifically how they will determine those factors. Without more, the Court is unable to conclude that the Counties have adequately pled proximate cause as to this claim. But again, by separate petition as indicated *infra*, the Counties may ask for limited and tailored discovery so as to be able to plead a more substantial claim.

As to lost utility fees, the Counties mention these only in passing and do not in any way flesh out the connection between Defendants' alleged equity-stripping practices and the loss of the fees, nor do the Counties articulate how that link will be calculated with any specificity. Here, too, without more, the lack of specificity may be the undoing of this claim, unless the Counties are forthcoming with an Amended Complaint that fortifies their claim.

vi.  Non-Economic Damages[10]

The Counties seek to recover for injuries stemming from non-economic as well as economic damages. They allege they have been damaged by the segregative effects of increased foreclosures on minority homeowners, neighborhood blight, and urban decay, ECF No. 1 at ¶¶ 391-93, as well as by the "frustration of the various purposes and missions of [their] departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for their residents at large," ECF No. 1 at ¶ 415. The Counties further allege that county-based entities have had "to reallocate their human and financial resources away from their missions and purposes in order to address the foreclosure and home vacancy crisis caused in party by Defendants' discriminatory and predatory mortgage lending, servicing and foreclosure practices." *Id.* at ¶ 415.[11] This is a bridge too far.

The only court to give a pass to a claim for non-economic damages such as those the Counties assert here was the U.S. District Court for the Eastern District of Pennsylvania in *City of Philadelphia*. That court determined that "[a]lthough the precise 'boundaries of proximate cause under the FHA' remain undefined…. [t]he City has shown plausible proximate cause by alleging a connection between Wells Fargo's lending practices and the non-economic injuries to the City based on its goal of promoting fair housing as part of an integrated community." 2018 WL 424451 at *5. The court reasoned that, "[a]s a preliminary matter, non-economic injuries of this nature are

---

[10] In this category the Court includes neighborhood deterioration, blight and urban decay, the segregative effect of Defendants' alleged equity-stripping, and the encroachment on the Counties' missions of supporting diverse and inclusive communities.

[11] As to diverting resources, the Counties also allege that they have: "been damaged as a result of the necessary reallocation of their limited resources, as well as to their missions to provide fair and affordable housing and prevent urban blight" ECF No. 1 at ¶ 9, and have "been required to shift their limited resources to address problems created by such vacancies and foreclosures," *id.* at ¶ 402.

generally cognizable under the FHA." *Id.* (collecting cases) (internal citations omitted). The court also noted that non-economic "injuries are especially cognizable when, as here, resources are allegedly spent by a plaintiff to combat the non-economic harm" *Id.*

On the other hand, courts in the *Cook County* cases have flatly rejected comparable claims, holding that non-economic harms are too far removed from the Banks' supposedly discriminatory action to satisfy proximate cause. *See Cook County (Bank of America)*, 2018 WL 1561725 at *5-7; *Cook County (Wells Fargo)*, 314 F.Supp.3d at 989-90 ("Isolating the effects of Wells Fargo's equity-stripping practice on patterns of racial segregation in Cook County would require the very kind of 'massive and complex damages litigation' against which the Supreme Court has strongly cautioned.") (citing *City of Miami*, 137 S.Ct. at 1306); *Cook County (HSBC)*, 314 F.Supp.3d at 970.

The Court in *City of Oakland* dismissed similar claims without prejudice on standing grounds without reaching proximate cause, 2018 WL 3008538 at *12.

This Court will join the courts that have rejected these non-economic claims as too far removed from the alleged discriminatory conduct to be plausibly proximately caused by such actions, and will **DISMISS** them, at least insofar as money damages are sought. However, to the extent that the Counties are seeking injunctive or declaratory relief against Defendants' alleged equity-stripping practices, the proximate cause requirement being less strict, the Counties may proceed. *City of Oakland*, 2018 WL 3008538 at *12 ("[w]hile *Miami*'s directness requirement appears to apply to claims for damages, it does not appear to extend to claims for injunctions or declaratory relief, *see Miami*, 137 S. Ct. at 1305-06.").

*e.* *Statute of Limitations*

Defendants allege that based on certain communications sent, for instance, by the Montgomery County Attorney to the Montgomery County Council, the Counties had actual knowledge of their purportedly actionable injuries more than three years before the present suit was filed, which is to say, out of time. *See* ECF No. 26 n.25. The Court is unable to resolve this issue at this early stage of the proceedings.

Dismissal of a case at the pleading stage for statute of limitations reasons is generally disfavored. A complaint should only be dismissed based on limitations if it is obvious from its face that it is untimely. *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2007). When a court is ruling on a Motion to Dismiss pursuant to Rule 12(b)(6), it generally may not consider extrinsic evidence, *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011), although it may take judicial notice of matters of public record. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

However, where "a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal citation omitted). A document is integral to a complaint when its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801, 806 (E.D. Va. 2007). For instance, "courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract

dispute." *Fisher v. Md. Dept. of Public Safety and Correctional Services*, Civ. No. JFM 10-0206, 2010 WL 2732334 (D. Md. July 8, 2010).

But the existence of internal memos by and between County officials, particularly without more context, does not by itself dispose of the Counties' claims. The type of fact-weighing Defendants ask the Court to engage in is well beyond the bounds of a Motion to Dismiss, which tests only the sufficiency of the Complaint. Defendants' limitations argument is more appropriately raised on a motion for summary judgment.

### f. Disparate Impact and Disparate Treatment

The Supreme Court discussed the contours of a disparate impact theory in the context of an FHA claim in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project,* 135 S. Ct. 2507, 2523-24 (2015). The Fourth Circuit elaborated on the Supreme Court's ruling in *Reyes v. Waples Mobile Home Park Limited Partnership*, 903 F.3d 415 (4th Cir. 2018). It explained that, per *Inclusive Communities*, an FHA disparate impact claim should be analyzed under a three-step burden-shifting framework: First, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact. Second, the defendant has the burden of persuasion to explain the valid interests served by their policies. Third, the plaintiff must prove that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect." *Reyes*, 903 F.3d at 424 (quoting *Inclusive Communities*, 135 S. Ct. at 2515, 2522-23.

Because a motion to dismiss tests the sufficiency of the complaint, only the first step is in play at this juncture, i.e. the Court is called upon to consider whether the Counties have demonstrated a robust causal connection between the challenged policy (or policies) and the

disparate impact. Defendants challenge the Counties in this regard by arguing (a) that the Counties do not point to a specific policy to challenge, but rather lump together broad categories of Defendants' mortgage operations and challenge them all, and (b) that the Counties' statistics do not demonstrate disparate impact.

But the Counties unquestionably do challenge a specific policy or policies of Defendants, viz., equity stripping, which the Counties describe as a "pattern and practice of discrimination that begins with steering minorities into non-prime loans, continues through servicing, and ends with foreclosure or vacancy." ECF No. 38 at 4. Other courts have clearly held that equity-stripping is a specific policy challengable under the *Inclusive Communities* framework. *See County of Cook v. Bank of America Corporation*, No. 14 c 2280, 2018 WL 1561725 (N.D. Ill, March 30, 2018) at *9; *County of Cook, Illinois v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 992 (N.D. Ill. March 26, 2018). Even considered as discrete practices, the Counties have identified several practices, which is to say policies, within the processes of loan origination, servicing, and foreclosure that are challengable. *See County of Cook v. HSBC North America Holdings Inc.*, 314 F. Supp. 3d 950, 967 (N.D. Ill. May 30, 2018) (accepting the morass of policies identified by Cook County as sufficient under *Inclusive Communities*, pointing to allegations about "mortgage lending and services policies; pricing and marketing policies; various underwriting policies; loan servicing and loss mitigation policies; and foreclosure-related policies.").

The Court also finds the Counties have appropriately alleged disparate treatment. Several district courts have found that evidence of targeting and/or reverse redlining, such as alleged here, may establish discriminatory intent in housing discrimination cases. *See, e.g., City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857, 2011 U.S. Dist. LEXIS 48522, at *48-49, n. 56 ("Many courts have held that the practice of reverse redlining is a violation of the FHA and will support a

claim for disparate treatment.") (citing cases from courts nationwide supportive of this proposition); *Cty. of Cook v. HSBC N. Am. Holdings, Inc*., 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015) (defendant "intentionally targeted and marketed predatory subprime loans to minority borrowers to their detriment and the detriment of the County.") Alternatively, the Counties have identified specific practices by which, the Counties say, Defendants targeted minority borrowers for predatory lending keyed to their race. *See, e.g.*, *Cook County (HSBC)*, 314 F.Supp.3d at 967. Insofar as Defendants are arguing that the Counties must elect one or the other theory of discrimination on which they intend to proceed, at this stage, they are not obliged to do so. *Reyes*, 903 F.3d at 421.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 24) is **GRANTED-IN-PART, DEFERRED-IN-PART,** and **DENIED-IN-PART**. The Court will **GRANT** the Counties ninety (90) days within which to amend their complaint in accordance with the foregoing discussion. If the Counties need specific limited discovery to be able to fortify their claims as set forth herein, they should petition the court within twenty (20) days. Defendants may file an Opposition to such petition within fifteen (15) days and the Counties may reply within ten (10) days. If the Counties do file an Amended Complaint, Defendants may file a second Motion to Dismiss, as described in the accompanying Order.

A separate Order will **ISSUE**.


_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**August 9, 2019**