IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **PRINCE GEORGE'S COUNTY, MARYLAND,** *et al.*, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil No. **18-3576 PJM** |
| **WELLS FARGO & CO.** *et al.*, | * * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Prince George's County and Montgomery County, Maryland, filed this suit against Defendants Wells Fargo & Company and related entities[1] (collectively "Wells Fargo") based on allegations of predatory and discriminatory residential mortgage lending, servicing, and foreclosure practices in violation of the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 *et seq.* After the Court deferred ruling in part on Wells Fargo's first motion to dismiss, the Counties filed an amended complaint, and Wells Fargo thereafter filed the present Motion to Dismiss the Amended Complaint. Having considered the parties' principal and supplemental briefs and held oral argument, the Court will **GRANT IN PART** and **DENY IN PART** the motion.

**I. Background**

The Counties allege that Wells Fargo engaged in predatory lending practices relative to racial minority communities, in their respective jurisdictions, which they say contributed to the recent financial crisis, as characterized by mortgage loan delinquencies, defaults, foreclosures, and

---

[1] Other Defendants include Wells Fargo Bank, N.A. (a subsidiary of Wells Fargo & Co.), Wells Fargo Financial, Inc. (previously a subsidiary of Wells Fargo & Co., until it transferred its lending operations to Wells Fargo Bank), and Wells Fargo "John Doe" Corps. 1–375 (affiliates or subsidiaries of Wells Fargo & Co. that may be responsible for the conduct alleged in the complaint).

home vacancies in the Counties, particularly in communities with high concentrations of FHA-protected minority residents. Am. Compl. ¶¶ 3–4, ECF No. 62. The Counties proceed under both disparate-impact and disparate-treatment theories and allege both economic and noneconomic harms.

The suit proceeds in three counts: count I, disparate impact resulting from Wells Fargo's equity-stripping scheme, beginning with loan origination and continuing through servicing and mortgage foreclosure, *id.* ¶¶ 443–67; count II, disparate impact based solely on Wells Fargo's mortgage servicing and foreclosure practices, *id.* ¶¶ 468–82; and count III, intentional disparate treatment throughout the entire equity-stripping scheme, *id.* ¶¶ 483–93. The Counties allege five general categories of injuries: (1) foreclosure processing costs, (2) increased cost of municipal services (i.e., municipal expenditure), (3) economic injuries to the Counties' tax base, (4) lost municipal income, and (5) various noneconomic injuries. *See* Mem. Op. at 2–3, ECF No. 53.

In its decision on Wells Fargo's motion to dismiss the original complaint, the Court held that the Counties had sufficiently pleaded their claims regarding foreclosure processing costs but found that the alleged noneconomic injuries for money damages were too far removed from the alleged discriminatory conduct to have been plausibly proximately caused by Wells Fargo. *Id.* at 17. The Court therefore dismissed the noneconomic claims for money damages but held that the Counties could proceed on those claims insofar as they seek injunctive or declaratory relief. *See id.* The Court deferred decision on the Counties' other claims and granted them the opportunity to amend their complaint "setting forth in more detail how the losses caused by [Wells Fargo's] purported violations may be ascertainable through a regression analysis or other specific method." Order at 1–2, ECF No. 54. With the filing of an amended complaint, the viability of the remaining

claims is again at issue: (1) economic injury to the Counties' tax base, (2) increased municipal expenditure, and (3) lost municipal income.

In their amended complaint, the Counties describe a "downward spiral in home prices, in assessed home values, and in property tax collections" caused by "concentrations of foreclosures and increasing rates of foreclosures," including lower sales prices on pre-foreclosure homes. Am. Compl. ¶¶ 389–90. The fair market value of residential real estate in certain communities, they submit, was "adversely impacted" by Wells Fargo's discriminatory foreclosures. *Id.* ¶ 392.

To prove proximate causation of their monetary damages, the Counties state that they will "us[e] foreclosure property addresses, borrower names, and foreclosure event date information," derived from Wells Fargo's "loan origination, loan servicing, and loan default and foreclosure data," to isolate and establish damages caused by "foreclosures on properties secured by mortgage loans originated, acquired, serviced, or foreclosed on" by Wells Fargo by reason of the alleged discriminatory practices. *Id.* ¶ 393. The Counties maintain that the "critical aspect" of proving damages will be identifying individual properties where damages occurred as result of Wells Fargo's discriminatory practices, and that Wells Fargo's loan data are the only source of information "that links affected borrowers and their property locations to [the] discriminatory practices." *Id.* ¶ 394.

The Counties suggest that their experts' analysis[2] of the loan data will "us[e] standard statistical and regression techniques" to isolate the "discriminatory loans/foreclosures from non-discriminatory loans/foreclosures," and the Counties can then "identify the specific foreclosures and vacancies" that resulted from Wells Fargo's alleged discriminatory practices. *Id.* ¶¶ 396–97.

---

[2] Although a single expert declaration was filed in support of the Counties' claims, the Counties' amended complaint consistently refers to "experts." The Court understands that the Counties may rely on more than one expert to complete the necessary analyses but clarifies that at this time only one such expert has been identified.

Only then can experts "calculate the[] tax base-related damages using regression analysis."[3] *Id.* ¶ 397. The Counties will then "search their own regularly maintained databases to find their out-of-pocket damages information specific to those foreclosures within the appropriate time frame for which" Wells Fargo is allegedly responsible. *Id.*

### A. Tax-Base Claim

As to the tax-base injury, the Counties explain in their amended complaint that "[p]roperty taxes are the primary way" that they pay for municipal services, and the amount of property taxes collected "depends on the value of the property being taxed and the tax rate that is applied (the millage rate)." *Id.* ¶ 401. A decline in the value of the Counties' tax base therefore purportedly injures the Counties directly by reducing the amount of property taxes they can collect at a given millage rate. *Id.* ¶ 402. Foreclosures, it is argued, particularly when concentrated, reduce the value of the foreclosed property, reduce the value of surrounding properties, and consequently shrink the property tax base going forward. *Id.* ¶ 403.

The Counties note that, in assessing the values of residential properties, the state of Maryland considers myriad factors, including the sales prices of surrounding and comparable properties. *Id.* ¶ 404. They assert that regression analysis will allow them to "accurately and confidently isolate the amount of their tax base related damages" that were a direct result of Wells Fargo's discriminatory practices, as opposed to other factors. *Id.* ¶ 406.

The Counties have attached to the amended complaint a declaration by Dr. Charles Cowan, a data analytics expert, who states that regression models are used in a variety of applications and

---

[3] "Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables." Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 303, 305 (3d ed. 2011). This tool can be "well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables." *Id.*

contexts, including "to measure the reduction in value of properties due to specific events such as an environmental disaster or," as here, "as a result of foreclosures." Cowan Decl. ¶¶ 7–10, ECF No. 62-2. Dr. Cowan explains how, having been engaged to calculate the Counties' tax base–related damages, he will use Wells Fargo's loan data, including property addresses and sales amounts, to conduct three standardized regression analyses: one to compute tax appraisal values based on sales price estimates, allowing for the calculation of total property taxes; a second examining the impact of foreclosure sales prices on tax appraisal values and, subsequently, total property taxes; and a third determining both "the extent to which foreclosures cause nearby properties to lose value" and the comparative "rate at which properties in higher minority areas with higher concentrations of foreclosures lose value" and the attendant amount of lost property taxes. *Id.* ¶¶ 13–16. These analyses "will enable [him] to calculate the impact of [Wells Fargo's] foreclosures at issue" on the Counties' property tax collections, thereby allowing the Counties to "isolate the actual amount of their tax-base-related damages" resulting from Wells Fargo's discriminatory practices. *Id.* ¶ 21.

### B.  Municipal Expenditure Claim

As to the increased municipal services claim, the Counties allege that Wells Fargo's failure to secure and care for abandoned and vacant properties has occasioned their building code enforcement, police departments, and fire departments personnel time and out-of-pocket costs by requiring that those components address events on those properties that threaten public health and safety. Am. Compl. ¶¶ 421–22. The Counties again state that they can demonstrate proximate cause by correlating Wells Fargo's loan data (specifically, the relevant property addresses and timeframes) with their own regularly maintained event and cost data (i.e., the cost of government resources expended at those vacant or foreclosed properties during the relevant timeframes). *Id.*

¶¶ 423–24. After completing that cross-check, the Counties "can then produce documentary support to prove the amount of their damages from their records, including their budgets and appropriations, various contracts, and task performance information." *Id.* ¶ 425. They indicate that they will be able to complete a similar process with the data from their social service organizations, budgets and appropriations, various contracts, and task performance information to determine the costs of helping displaced families who faced foreclosure and eviction as a result of Wells Fargo's discriminatory practices. *Id.* ¶ 426.

### C. Lost Municipal Income Claim

Finally, as to the lost franchise tax and utility-related damages claim, Counties allege that, because many of Wells Fargo's foreclosures resulting from discriminatory practices were delayed (the so-called "zombie foreclosures"), the Counties lost revenue due to unpaid franchise taxes and utility service costs from the homes that sat vacant over significant periods of time. *Id.* ¶¶ 410–11. The Counties claim that, once they have Wells Fargo's loan data in hand, they can search their databases and records for each relevant property address and timeframe to establish the damages resulting from lost utility and franchise-tax revenue on that property. *Id.* ¶¶ 412–13. They contend that determining their damages on a property-to-property basis using Wells Fargo's loan data "will ensure that [the] damages are a direct result" of Wells Fargo's alleged discriminatory conduct. *Id.* ¶ 414.

### II. Legal Standard

### A. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires "more than a sheer possibility that a

defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Legal conclusions couched as factual allegations and "unwarranted inferences, unreasonable conclusions, or arguments" do not satisfy the plausibility pleading standard. *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). The complaint's factual allegations must fairly apprise the defendant of "what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

### B. Fair Housing Act

As explained in the Court's opinion on the first motion to dismiss, the Fair Housing Act is a "far-reaching" statute that "takes aim at discrimination that might be found throughout the real estate market and throughout the process of buying, maintaining, or selling a home." *City of Miami v. Wells Fargo & Co.* (*Miami II*), 923 F.3d 1260, 1279 (11th Cir. 2019), *vacated as moot sub nom. Bank of Am. Corp. v. City of Miami*, 140 S. Ct. 1259 (2020) (mem.). Here, as in parallel litigation in other federal courts, the defendant bank argues that the plaintiff municipalities have not set forth causes of action because "the complaint fails to draw a 'proximate-cause' connection between the violation claimed and the harm allegedly suffered." *Bank of Am. Corp. v. City of Miami* (*Miami I*), 137 S. Ct. 1296, 1301 (2017).

In *Miami I*, the Supreme Court held that "foreseeability alone is not sufficient to establish proximate cause under the FHA," which "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 1305–06 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). However, the Court left it to the lower courts to "define, in the first instance,

7

the contours of proximate cause under the FHA and decide how that standard applies to [a municipality's] claims for lost property-tax revenue and increased municipal expenses." *Id.*

This Court explained in its previous opinion that it "agree[d] with the Eleventh Circuit [in *Miami II*] that proximate cause in the context of FHA suits, such as the present one, is fairly pled where the injury is directly traceable to the purported violation, without a discontinuity that breaks the connection." Mem. Op. at 8;[4] *see also City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112 (9th Cir. 2020) (adopting similar standard in another parallel FHA case, finding the statute "to be broad and inclusive enough to encompass less direct, aggregate, and city-wide injuries"). Thus, that is the proximate-cause standard that guides the ensuing analysis of the Counties' amended allegations.

### III. Analysis

Wells Fargo has moved to dismiss the three claims as to which the Court earlier deferred decision. "The question for now is whether, accepting the allegations as true, as we must, the [Counties] ha[ve] said enough to make out a plausible case—not whether [they] will probably prevail." *Miami II*, 923 F.3d at 1264. The Court now concludes that the Counties have plausibly alleged injurious violations of the FHA as to their tax-base and municipal services expenditure claims but that their allegations continue to fall short as to the lost municipal income claim.

---

[4] Wells Fargo argues that the Court should no longer consider the Eleventh Circuit's reasoning in *Miami II* persuasive or even relevant following the Supreme Court's vacatur of that opinion. This Court disagrees. The Supreme Court's vacatur—which was done as a procedural matter pursuant to the *Munsingwear* doctrine and did not touch on the merits—has no substantive effect on this case. *See generally United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). Although the Eleventh Circuit's opinion is not and has never been controlling here, the Court has already stated that it finds the Eleventh Circuit's analysis persuasive. The vacatur does not alter that conclusion.

### A. Tax-Base Claim

The Counties have sufficiently alleged injury to their property tax base that is "directly traceable" to Wells Fargo's discriminatory lending practices.

*1.*

Wells Fargo first argues that the Counties failed to plead an injury in fact sufficient to establish Article III standing. Specifically, Wells Fargo contends that the Counties have not alleged injury to their overall property tax revenue because the Counties' ability to determine the applied tax rate (i.e., the millage rate) generally allows them to stabilize the amount of property tax revenue even when the overall tax base declines. The Counties argue that the collateral-source rule precludes any consideration of their overall tax revenue in consideration of the tax-base injury. "The common law collateral source rule provides that a tort award should not be offset by compensation that a plaintiff receives from another source." *Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 465 n.9 (D. Md. 2000) (citing *United States v. Price*, 288 F.2d 448, 449–50 (4th Cir. 1961)). Because "[a] damages action under the [FHA] sounds basically in tort," *Curtis v. Loether*, 415 U.S. 189, 195 (1974), the Court finds the theory relevant here.

Wells Fargo argues that the collateral-source rule should not apply here, relying on two related cases from another district court that declined to apply the rule to claims of decreased tax revenue as a result of discriminatory lending practices. *See L.A. Unified Sch. Dist. (LAUSD) v. Bank of Am. Corp.*, No. 14-cv-7364, 2015 WL 13653868 (C.D. Cal. Jan. 7, 2015); *LAUSD v. Citigroup Inc.*, No. 14-cv-7368, 2015 WL 476303 (C.D. Cal. Feb. 3, 2015). The Court finds those cases inapposite. The plaintiffs there were not municipalities alleging direct injury to their tax bases as are the Counties here; rather, they were school districts alleging injury to their funding, which was not directly derived from property taxes but was determined by the state legislature.

9

*See LAUSD*, 2015 WL 13653868, at *4 ("LAUSD suffered no injury because its funding level is not dependent on the amount of property taxes collected within its boundaries. Instead, the amount of funding LAUSD receives is based on policy decisions made by the California Legislature."). In contrast, the Counties' tax-base injury in the case at bar is concrete and bears "some direct relation" to the alleged predatory lending; it is not undermined by the Counties' limited ability to offset the injury to their overall tax revenue caused by Wells Fargo's alleged conduct. The Court thus concludes that the collateral-source rule applies, with the result that the Counties' overall property tax revenue from one year to the next is not, strictly speaking, relevant to the question of whether they suffered an injury to their tax base. The Court finds that the collateral-source rule is independently dispositive of Wells Fargo's motion to dismiss the tax-base claim for failure to plead injury in fact.

But even if the collateral-source rule were not applicable here, the Court would find that the Counties have nevertheless established appropriate injury in fact. As an initial matter, the Supreme Court has expressly held that "[a] significant reduction in property values directly injures a municipality by diminishing its tax base." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979). That is precisely the injury alleged here.

Wells Fargo views the Counties' power to determine the millage rate as fatal to their claim of injury here, apart from the collateral-source rule. The Court disagrees. Setting the millage rate is not the equivalent of waving a magic wand to grow the county treasury. The Counties' ability to adjust millage rates in response to declines in the overall value of their tax bases due to foreclosures is subject to practical limits, given that a higher millage rate affects properties countywide. The Counties therefore arguably suffer an injury to their tax base whether or not their overall property tax revenue remains stable over time. Regardless of the total property tax revenue

collected during the relevant period, the Counties may suffer an injury in fact if their "property-tax revenue could have been higher absent the discriminatory lending." *City of L.A. v. Citigroup Inc.*, 24 F. Supp. 3d 940, 948 (C.D. Cal. 2014).

2.

Wells Fargo next argues that the Counties fail to show how they can isolate and plausibly calculate the amount of tax revenue loss attributable to Wells Fargo's alleged discriminatory conduct. In its earlier opinion, the Court directed the Counties to plead their tax-base injury with more specificity by showing *how* they propose to "isolate and ultimately prove damages to the Counties' tax bases," such that the "'direct relation' between the two is clear." Mem. Op. at 14; *see also Miami II*, 923 F.3d at 1281 ("Perhaps the most important step in the proximate cause analysis in this case is consideration of 'what is administratively possible and convenient.'") (quoting *Miami I*, 137 S. Ct. at 1306)). This is where the matter of regression analysis comes in: Have the Counties sufficiently explained how they, with the aid of experts, can use regression analyses to isolate the tax-base injuries they suffered as a direct result of Wells Fargo's alleged equity-stripping scheme?

The Court is persuaded that they have. In addition to Dr. Cowan's declaration[5] and supplemental materials explaining this methodology,[6] the Court looks to the *Oakland* case for guidance. In that case, the city of Oakland conducted certain initial regression analyses at the pleading stage, since the city already had relevant data, which "Wells Fargo reports to local and federal authorities." *Oakland*, 972 F.3d at 1118–19 & n.6. Oakland explained in its complaint how those regression analyses were controlled for credit history and other factors, then revealed, for

---

[5] The Court expressly incorporates by reference, for pleading purposes only at this stage, the declaration of Dr. Cowan, ECF No. 62-2.

[6] *E.g.*, Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 303 (3d ed. 2011).

11

example, exactly how much more likely discriminatory loans were for an African American borrower in Oakland, as opposed a similar white borrower (2.583 times), and for a borrower in a majority-minority neighborhood, as opposed to a nonminority neighborhood (3.207 times). Am. Compl. ¶¶ 68, 70, *Oakland*, No. 15-cv-4321 (N.D. Cal. Aug. 15, 2017). Regression analyses further revealed, among other things, the exact greater likelihood that the borrowers of those discriminatory, high-risk loans would suffer foreclosure (2.573 times for African American borrowers, 3.312 for Latino borrowers). *Id.* ¶ 91.

Crucially, using Hedonic regression,[7] Oakland was able to quantify its property tax losses attributable to Wells Fargo's practices by correlating the reduction in property values with addresses in Oakland where discriminatory loans issued by Wells Fargo entered the foreclosure process. *Id.* ¶ 114; *id.* Ex. A (sample chart demonstrating that correlation). Oakland then explained how Hedonic regression techniques would allow them to "*isolate* the lost property value attributable to Wells Fargo foreclosures *and vacancies* caused by discriminatory lending from losses attributable to other causes, such as neighborhood conditions." *Id.* ¶ 120 (emphases added). The Ninth Circuit thus found that Oakland had plausibly alleged proximate cause "through sophisticated and well-explained statistical regression analyses." *Oakland*, 972 F.3d at 1132.

This Court is persuaded that, as alleged in the Counties' amended complaint, similar regression analysis techniques would be meaningful here in demonstrating "some direct relation" between Wells Fargo's alleged discriminatory loans and the Counties' reduced tax revenue from affected properties. *See also Miami II*, 923 F.3d at 1283 (finding that the complaints "suffice to describe the analysis in far more than speculative or conclusory fashion," even though the city did

---

[7] Hedonic regression is a method of analysis that "isolates the factors that contribute to the value of a property by studying thousands of transactions" and "determines the contribution of each of these factors to the value of a home." *Oakland*, 972 F.3d at 1120 n.11.

"not go so far as to conduct this analysis and attach the results to its pleadings"). "In other words, if [the Counties'] Hedonic regression analysis operates as it is explained in the [amended] complaint," there is no discontinuity that breaks the connection. *Oakland*, 972 F.3d at 1133.

Wells Fargo advances various arguments challenging the use of regression analyses in general, while sidestepping the reasoning in *Miami II* and *Oakland*.[8] Rather than contending that the Counties' assertions regarding the efficacy of regression analysis in this context fall short of the required level of specificity, Wells Fargo urges the Court to apply a different standard. It first argues that the Counties have failed to account for "multiple independent and intervening factors" affecting the calculation of property values and taxes. The Court finds this argument unavailing because most of the "independent variables posited by [Wells Fargo] occur before foreclosure." *Miami II*, 923 F.3d at 1277. Once increased foreclosures occur on a countywide basis, the Counties' "substantially decreased tax base is clear, direct and immediate," without "intervening roadblocks." *Id.*; *see also Oakland*, 972 F.3d at 1133 ("Oakland's regression analyses plausibly and thoroughly account for other variables that might explain Oakland's reduced tax base, such that Oakland's injury can be surely attributed to Wells Fargo," especially "because Oakland's claims are aggregate, city-wide claims that are well-suited for data-driven statistical regression analyses.").

Wells Fargo also suggests that it will be impossible for the Counties to calculate what the assessed value of a property would have been if no foreclosure had occurred, because the existing assessments were conducted only every three years and by the state of Maryland, an independent party. But the Court's understanding is that the regression analyses the Counties describe are able

---

[8] Wells Fargo attempts to distinguish *Miami* and *Oakland* from the present case on the basis that the Counties here have failed to allege diminution of their overall property tax revenue. But that argument goes to whether there exists a cognizable injury, as discussed above, not whether that injury can be sufficiently isolated and traced such that proximate cause has been adequately alleged.

13

to take into account how and when the property tax values were assessed, as it appears that the relevant information for this aspect of the analysis would not be *who* completed the property assessment but *how* they did so—specifically, what factors were considered in making the assessments. Those factors are identifiable, and, indeed, the Counties identify them. They explain in their amended complaint precisely which factors Maryland considers in valuing residential property, including the nature and effect of its "neighborhood adjustment." Am. Compl. ¶¶ 404–05.

Wells Fargo further argues that Dr. Cowan's expert declaration cannot not otherwise "salvage" the tax-base claim. But, for the reasons explained above, the Court is satisfied that the Counties—with the aid of, but by no means exclusively through, Dr. Cowan's declaration—have plausibly alleged that the use of regression analysis will allow them to sufficiently demonstrate proximate cause.

Finally, Wells Fargo suggests that the proposed analyses would only address *foreclosures* as a proximate cause of tax-base injury, not the challenged *lending*. The Court disagrees with this suggestion. The amended complaint explains that the regression analysis would require use of Wells Fargo's "mortgage loan origination and servicing data," which go far beyond foreclosures to include "every useful data point over the life of a mortgage loan." Am. Compl. ¶¶ 394–95. The Court understands that this data will allow the Counties to identify those borrowers affected by the alleged discriminatory practices—and the Counties' experts will then be able to correlate the property data for those borrowers with the Counties' property assessment and tax data.

It is by no means certain that the Counties will ultimately prevail on their tax-base claim, but for now the allegations suffice to survive a motion to dismiss, and they "must be afforded an

opportunity to conduct discovery and obtain more property-specific information." *City of L.A.*, 24 F. Supp. 3d at 950. The Court **DENIES** the motion to dismiss as to the tax-base claim.

### B. Municipal Expenditure Claim

For similar reasons, the Court is satisfied that the Counties have now met their burden as to their municipal expenditure claim. Specifically, the amended complaint sufficiently alleges that the additional municipal expenditures necessitated by the abandoned and foreclosed properties were a direct result of Wells Fargo's alleged discriminatory lending practices and, further, that Dr. Cowan's proposed regression analyses will allow the Counties to isolate the damages attributable to Wells Fargo by matching the property addresses at issue and the relevant time period to the Counties' own event and cost data for additional services to those properties.[9] For the present, at least, the claim passes muster. Thus, the Court **DENIES** the motion to dismiss as to the municipal expenditure claim.

### C. Lost Municipal Income Claim

Here the Court draws the line. It views the lost municipal income claim as a bridge too far. The central question as to this claim is whether the Counties' claimed loss of franchise-tax and utility revenue is too removed from the alleged discriminatory lending in the chain of causation. In the amended complaint, the Counties certainly attempt to "flesh out the connection" between the alleged equity-stripping and the loss of franchise-tax and utility revenue, but the Court concludes that, beyond mere foreseeability, this connection is not sufficiently direct to constitute

---

[9] Both the Eleventh and Ninth Circuits rejected the increased municipal expenditure claims of the plaintiffs in *Miami* and *Oakland*, respectively. However, the Counties here plead this claim with more specificity than the plaintiffs in those cases. Unlike Miami and Oakland, the Counties describe how—just as with their tax-base claim—they will use regression analysis to trace specific municipal expenditures during the relevant period to specific properties vacated or foreclosed after discriminatory lending by Wells Fargo. *Compare* Am. Compl. ¶¶ 421–26, *with* Am. Compl. ¶¶ 129–39, *Oakland*, No. 15-cv-4321 (N.D. Cal. Aug. 15, 2017), *and* Am. Compl. ¶¶ 110–21, *Miami*, No. 13-cv-24508 (S.D. Fla. Nov. 15, 2015).

the requisite proximate cause. The alleged damages on this claim do not pass directly to the Counties in the same way property tax revenue does. The Counties' franchise taxes or fees are derived not from the property owners but from third-party cable companies. Similarly, the Counties' utility revenue is derived from the relevant "government-affiliated utility." Diminished revenue from reduced cable or utility use may come about for reasons wholly independent of predatory lending. In the Court's view, these extra links in the causal chain create "a discontinuity to call into question whether the alleged misconduct led to the injury." Mem. Op. at 7. Accordingly, the Court **GRANTS** the motion to dismiss as to the lost municipal income claim.

### D.  Noneconomic Injuries

The Court has already held that this case may go forward on the noneconomic claims for injunctive relief but has dismissed the noneconomic claims for money damages. *See* Mem. Op. at 17 ("[T]o the extent that the Counties are seeking injunctive or declaratory relief against [Wells Fargo's] alleged equity-stripping practices, the proximate cause requirement being less strict, the Counties may proceed." (citing *Miami I*, 137 S. Ct. at 1305–06)); Order at 2, ECF No. 54. The Court will not entertain Wells Fargo's attempts to argue otherwise. Its earlier ruling stands.

### IV. Conclusion

In sum, while the Counties' pleadings fall short as to their lost municipal income claim and noneconomic claims for damages, they may proceed on the foreclosure processing, tax-base, and municipal expenditure claims and on the noneconomic claims for injunctive relief.[10]

A separate order will issue.

---

[10] Prior to filing the amended complaint, the Counties moved for limited discovery, which the Court concluded was "not necessary (if not improper)" at that early stage. Mem. Op. at 4, ECF No. 60. Following the Court's ruling on the motion to dismiss the amended complaint finding three of the Counties' claims viable, discovery is in order.

February 17, 2021

/s/ PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE